FAMILY FINANCE COMPANY *et al. v.* ALLMAN.

468

No. 8436.   FEBRUARY 19, 1932.

*Henderson L. Lanham, Howell, Heyman & Bolding,* and *Clifford Walker,* for plaintiffs in error.

*M. B. Eubanks,* contra.

RUSSELL, C. J. (After stating the foregoing facts.)

■ The rulings contained in the first, second, and third headnotes require no elaboration.

■ As held by this court in *Badger* v. *State,* 154 *Ga.* 443 (supra), the small-loan act of 1920 (Ga. L. 1920, p. 215) does not violate article 1, section 4, paragraph 1, of the constitution of this State, which provides that no special law shall be enacted in any case where provision has been made by an existing general law. And it was held in *Morgan* v. *Lowry,* 168 *Ga.* 723-724 (149 S. E. 37), that this small-loan act does not violate the due-process clause of the State and Federal constitutions. The latter case was taken by appeal to the Supreme Court of the United States, and the appeal was dismissed for want of a substantial Federal question.

■ The main stress in this case is laid upon the provision of the act which authorizes lenders licensed thereunder to charge interest at the rate of three and one half per cent. per month. This provision has been attacked as an abuse of the power of classification, and as class legislation which gives the right to make unconscionable contracts, not only oppressive upon the borrower but discriminatory and unfair to bankers and other lenders, who are forbidden to charge a rate of interest in excess of eight per cent. per annum. It is also contended that section 13 of this act is unconstitutional, in that it violates article 1, section 4, paragraph 1, of the constitution of this State. As to the first point, it must be borne in mind that the question whether a State shall fix any rate of interest as a legal rate, or whether a State if it sees proper may limit the maximum rate of interest which may be charged for the use of money, is a matter wholly within the jurisdiction of a State, which under its police power may by law fix no rate at all, or may expressly declare the maximum rate of interest and denounce and forbid any higher rate. To use the language of Jus-

tice White in Griffith *v.* Connecticut, 218 U. S. 563, 569 (31 Sup. Ct. 132, 54 L. ed. 1151):

"It is elementary that the subject of the maximum amount to be charged by persons or corporations subject to the jurisdiction of a State for the use of money loaned within the jurisdiction of the State is one within the police power of such State. The power to regulate existing, the details of the legislation and the exceptions proper to be made rest primarily within the discretion of the State legislature; and 'unless such regulations are so unreasonable and extravagant as to interfere with property and personal rights of citizens, unnecessarily and arbitrarily, they are within the power of the State; and the classification of the subjects of such legislation, so long as such classification has a reasonable basis, and is not merely arbitrary selection without real difference between the subjects included and those omitted from the law, does not deny to the citizens the equal protection of the laws.'" Citing Watson *v.* Maryland, 218 U. S. 173 (30 Sup. Ct. 644, 54 L. ed. 987), and cit. In the Griffith case, the court quoted with approval the decision in State *v.* Hurlburt, 82 Conn. 232 (72 Atl. 1079). The Supreme Court of Connecticut said: "The exception from its operation of loans made by national banks was merely a recognition of the legal effect—in excluding State legislation on the same subject—of the statutes of the United States which regulate their right to make such contracts. The further exception in favor of loans by trust companies chartered by this State was fully justified by the peculiar character of these institutions, each created by a special act of legislation, and subject to the inspection of the bank commissioners. Gen. St. 1902, cc. 199, 202. There was also reasonable cause for the exception as to pawnbrokers. Their business can only be carried on by those found by public authority to be suitable persons to engage in it, and its character is such as to make it not improper to allow a charge of interest beyond the limit of 15 per cent. a year. Pub. Acts 1905, p. 438, c. 235. There was also sufficient reason for restricting the statute so that it should not apply to loans made to any bank or to any trust company chartered by this State. Such institutions, managed by those accustomed to financial operations and familiar with the worth of money in the market from day to day, might well be deemed to require no statutory protection against being forced by their

financial necessities to pay excessive interest for moneys borrowed. Nor is the act invalidated by the exception of mortgages. Publicity is one of the best safeguards against the making of unconscionable contracts. Under our recording system, it is rare that any bona fide mortgage, either of real or personal property, fails to be promptly spread upon the records of the town in which is situated the property which is its subject. So far as concerns chattel mortgages, also, our General Statutes of 1902 (sections 4132, 4134) had already made other and reasonable provision as to the rate of interest which might be charged, or which, in case of foreclosure, could be allowed. The General Assembly, in respect to the matter of usury, had the right to deal with different classes of money-lenders or money-borrowers in a different way, provided there were nothing apparently unreasonable in creating such distinctions, and all the members of each class were treated in the same manner. Heath & Milligan Co. *v.* Worst, 207 U. S. 338, 354 [28 Sup. Ct. 114, 52 L. ed. 236]; Home Telephone Co. *v.* Los Angeles, 211 U. S. 265, 281 [29 Sup. Ct. 50, 53 L. ed. 176]."

In the passage of the small-loan act of 1920 (Ga. L. 1920, p. 215), the legislature was only exercising a power of classification peculiarly within its prerogative, and in numerous decisions of this court which might be cited, if necessary, we have construed article 1, section 4, paragraph 1, of the constitution, which is to the effect that laws of a general nature shall have uniform operation throughout the State, and no special law shall be enacted for which provision has been made by an existing general law. As said by Mr. Justice Little in *Sasser* v. *Martin,* 101 *Ga.* 447, 454 (29 S. E. 278): "To clothe a law with a general character, in contradistinction to a local character, it is not essential that it should affect every person, object, or thing in the State, nor operate territorially through the entire limits and in all parts of the State. In the State there exists a great variety of subjects of legislation, each requiring provisions peculiar to itself. Generic subjects may be divided and subdivided into as many classes, . . . as voters, sane and insane persons, minors, husbands and wives, parents and children. Property is subject to division into classes. Thus timber lands, arable lands, mineral lands, urban and rural lands may be divided into classes for various purposes. Nearly every matter of public concern is divisible, and division is necessary to methodical legis-

lation. . . It is undoubtedly within the power of the legislature, for the purpose of exercising its legislative authority over the subjects thereof, to classify ad infinitum, and legislate with respect to each classification, without entering the realm of local legislation, with these limitations: . . The classification must be natural, not arbitrary; it must stand upon some reason, having regard to the character of legislation of which it is a feature. . . The other limitation is that the law must be coextensive with and operate uniformly upon the entire class to which it is applicable." This upon the subject of locality. Upon the question as to whether the act was special without regard to territorial locality, Mr. Justice Cobb, delivering the opinion in *Union Savings Bank* v. *Dottenheim,* 107 *Ga.* 606, 626-628 (34 S. E. 217), said:

"While the question now under consideration was not directly involved in the case of *Cook* v. *Loan Association,* 104 *Ga.* 814 [30 S. E. 911], some of the language used by Justice Lewis in the opinion in that case is pertinent to the present discussion. After referring to section 2401 of the Civil Code, which is in substance as follows: No fines, interest, or premiums paid on loans in building and loan associations shall be deemed usurious, and may be collected as other debts are collected and according to the agreement between the association and the borrower, he says: 'It is insisted by counsel for plaintiff in error that this act is unconstitutional, in that it seeks by special law to enact certain things for which provision has been made by an existing general law. It is contended that the legislature can not pass a general usury law, and afterwards exempt by special legislation a certain class from its operation. We do not think the statute obnoxious to this provision in the constitution. It was not intended to legalize a charge of usury by a building and loan association. In fact the legislature simply declared to be law what this court had previously decided was law. Besides, speaking for myself, I think that advances made by a building and loan association to its members differ so materially from other loan transactions that it was perfectly competent for the legislature to place them in a separate class for the purpose of regulating questions of usury and interest. Even if the act in question can be considered as special legislation, it contains nothing for which provision has been made by an existing general law. As before indicated, the general law in the

State on the subject of usury has no application to transactions of this sort by building and loan associations. But we do not think this section of the code above quoted either a local or a special law. It is certainly not local, for it is confined to no locality, but extends in its operation throughout the State. It is not special, because it embraces all citizens of the State, and gives to every person who may conform to its requirements the same rights and privileges.'

"The power of the legislature to classify subjects for legislation has been under consideration in a number of cases in different States in the Union, and the current of authority is undoubtedly in favor of the view that such power exists. In addition to the authorities cited by Justice Little in the opinion in *Sasser* v. *Martin,* supra, the following are some of the many decisions and text-books dealing with this subject: Cooley's Con. Lim. 153 (note) ; Caruthers *v.* Andrews, 2 Cold. (Tenn.) 378; McAunich *v.* Railroad Co., 20 Iowa, 338; Pritchett *v.* Stanislaus, 73 Cal. 310; Jackson *v.* Shawl, 29 Cal. 267; Kilgore *v.* Magee, 85 Pa. St. 401; Daniels *v.* Henshaw, 76 Cal. 436; Wheeler *v.* Phila., 77 Pa. 338; Walker *v.* Potter, 18 Ohio St. 85; State *v.* Pugh, 43 Ibid. 98; State *v.* Hudson, 44 Ibid. 137; State *v.* Smith, 48 Ibid. 211; Henderson *v.* Onahan, 48 N. E. (Ill.) 1003. It is unnecessary to multiply authority on this point, as the cases cited above from this court show that from a very short time after the adoption of the constitution of 1877 until the present time the right of the General Assembly of Georgia to classify subjects for legislation has been recognized and does not seem ever to have been seriously doubted.

"It remains now for the principles above referred to to be applied to the facts of the present case. When so applied, is the law under consideration a special law, and therefore inoperative because unconstitutional and void? Or, is it a general law because it operates equally upon all persons within the territorial limits of the State who can be brought within the sphere of its operation? The reasoning in the authorities above cited clearly demonstrates that it is not only within the power of the General Assembly to classify subjects for legislation, but that in many instances it is not only wise but necessary for the public good that there should be a classification. Of necessity, all laws can not bear equally upon all natural persons. Such persons have been always subject to classification for purposes of legislation.

One class is composed of those who are supposed to be able to protect themselves, as are all persons sui juris who labor under no disability; another class is composed of those who are supposed for some reason not to be able to take care of themselves, as infants, persons imprisoned, and others . . under disabilities of like character. A general law regulating the conduct of persons sui juris and operative upon every person within that class may coexist in the same territory with a general law operative only upon infants. Artificial persons—mere creatures of the law—are of necessity required to be formed into classes, in order that there may be intelligent legislation regulating the powers and disabilities of these creatures of the law. Rules which would be appropriate to railroad corporations might not be necessary or proper in the case of banking corporations. It might be wise to impose upon ordinary railroad corporations certain duties and responsibilities which it would be unwise and unjust to require of street-railway companies. Duties and liabilities might be imposed upon one class of street-railway corporations, when it would not be wise or just to impose them upon another. The dangers to the general public as well as to passengers growing out of the use of steam or electricity in propelling cars upon the streets of a city would be a sufficient reason for placing street-railway companies of this class in a different class from those propelled by animal power, so far as rules in regard to speed, etc., are concerned. This being true in regard to this particular class of corporations, and such a classification not being arbitrary but being founded in reason, other corporations created for the public convenience, to a large extent, may be subdivided into classes for the purposes of legislation, if the subdivision is founded upon any good reason. Banks may be divided into banks of issue and banks not of issue. Banks which do not pay their depositors interest on deposits may be separated for purposes of legislation from those which do. A bank which holds its depositors' funds subject to check is of a different species from a bank which holds the money of its depositors not subject to be drawn out by check. Each class of banks referred to occupies a position in the commercial world peculiar to itself. Each supplies in its peculiar way demands which can not be supplied by banks of any other class.

"Such being the case, it is proper for the General Assembly to

provide laws operating uniformly upon all members of the class, which will facilitate the object for which each class is formed. A savings bank which pays interest on deposits, and which holds the money of the depositor subject only to be drawn by surrender of the pass-book and not subject to check, occupies a relation to the financial world peculiar to itself. It is intended as a safe depositary of him who desires to place his savings in the hands of some one who will keep them, and hold them not subject to the demand check to which funds in banks of simple deposit are always subject. To a large extent, both their depositors and borrowers are men of small earnings and small savings. They come in contact with and supply the financial wants of the wage-earner whose income is generally daily, weekly, or monthly. Being institutions organized for the purpose of earning money for their depositors as well as for their stockholders, in order to facilitate their business with the class of people most apt to resort to them it was deemed wise by the General Assembly to place such institutions in a class that would be allowed to make contracts whereby the individual of small means, living upon a salary perhaps, could secure a loan upon terms of repayment that could be most conveniently met by him. Such contracts would not bear too heavily upon the borrower, and would be the means of securing a reasonable profit to the lender in the transaction. It is true that the arrangement contemplates the payment of a higher rate of interest than that allowed under the law applying to other corporations and private individuals in similar transactions. But if in the opinion of the General Assembly it is wise to allow this class of corporations to charge this higher rate of interest, it is not within the power of the courts to destroy this classification, unless it is manifest that it is purely arbitrary and founded upon no reason whatever. It might be that the reasons which moved the General Assembly in making the classification would not be entirely satisfactory to our minds as individuals; but no successful attack upon the law can be made unless it be shown that the classification is so unsupported by any reason whatever as to make it arbitrary and capricious. This has not been made to appear in the present case. All presumptions are in favor of the constitutionality of the law."

What is said in the foregoing quotation as to small savings in

savings banks is peculiarly applicable in the case at bar, for the very provision that restricts the lending to borrowers of $300 or less confines all dealings to small borrowers, whose circumstances must be urgent and their financial credit doubtful, or they would not be willing to pay the rate of interest permitted by the law. One purpose of the act was to provide some protection for the large class of shiftless as well as unfortunate people, who, either through extravagant living or dire misfortune, fall easy prey to what are denominated as "loan sharks," who (under the guise of purchasing wages) lend money at most unconscionable and exorbitant rates of interest, amounting in some instances where salary assignments had been renewed to as much as 200% per annum. *Broce* v. *Master Loan Service*, 171 *Ga.* 22 (154 S. E. 324).

■ The sixth headnote requires no elaboration.

■ The court erred in granting the interlocutory injunction.

*Judgment reversed. All the Justices concur.*